**OKLAHOMA TURNPIKE AUTHORITY, a Body Corporate and Politic, Plaintiff in Error,**

v.

**Manson C. KITCHEN, Defendant in Error.**

**No. 37796.**

Supreme Court of Oklahoma.

March 10, 1959.

Rehearing Denied April 14, 1959.

Jack B. Sellers, Drumright, Looney, Watts, Looney & Nichols, Oklahoma City, Rucker, Tabor & Cox, Joseph A. Sharp, Tulsa, for plaintiff in error.

Doyle Watson, Drumright, Cheek, Cheek & Cheek, Oklahoma City, for defendant in error.

JACKSON, Justice.

The plaintiff, Manson C. Kitchen, was injured in an automobile accident on the Turner Turnpike when his car was struck from the rear by another car driven by Barbara Reno. Plaintiff obtained judgment for $21,666 and defendant appealed. Plaintiff filed a motion to dismiss the appeal which was heretofore overruled. However in his brief on the merits, he reargues the motion to dismiss.

The motion to dismiss is based on the fact that the case-made filed in this court did not contain a journal entry overruling defendant's motion for new trial. Subsequent to the expiration of the time in which an appeal could be perfected the defendant, with leave of this court, withdrew the case-made for correction, and after a hearing the trial court signed a Nunc Pro Tunc order wherein it is recited that such an order was made on the date indicated in the reporter's transcript and then signed a journal entry overruling the motion for new trial as of said date.

In Lillard v. Meisberger, 113 Okl. 228, 240 P. 1067, 1069, we said:

"An order of the trial court overruling a motion for a new trial must be made with the same solemnity as a judgment on the merits, and a mere recital in the clerk's minutes as in the case at bar, which finds its way into the case-made, cannot be substituted for such an order, or supply the defect for failure to make it."

We are here confronted with a similar problem. The case-made contained the court reporter's transcript of the hearing on motion for new trial which includes the verbatim order of the court overruling the motion for new trial, but did not contain a journal entry.

However, Lillard v. Meisberger, supra, and other decisions to the same effect are not controlling because in the instant case there was an application made to withdraw and correct the case-made by inserting the order therein. Argentoes v. Fidelity Bldg. & Loan Ass'n, 127 Okl. 183, 260 P. 55. This leads us to an examination of the statute governing corrections of the case-made after it has been filed in this court.

12 O.S.1951 § 959, provides in part as follows:

"If, after any record or case-made is filed in the appellate court, in either a civil or a criminal cause, it shall appear that any matter which is of record in the court from which the appeal is taken, touching the cause appealed, or that any evidence heard on the trial of said cause, or that any statement or certificate or motion, *or other matter is omitted from such record or case-made* * * * the appellate court may * * * prepare such omitted parts and file such corrections in the appellate court, with like force and effect as though such corrected or added parts had been originally incorporated in the record or case-made. * * *." (Emphasis supplied.)

Plaintiff insists that the above statute only authorizes the withdrawal of the case-made for the purpose of including omitted matter if such omitted matter is *of record* at the time the application to withdraw is made. This contention is clearly supported by the fifth paragraph of the syllabus in Alexander v. First National Bank of Duncan, 136 Okl. 251, 277 P. 667, 668, wherein it is held:

"This court is authorized by section 786, C.O.S.1921 [12 O.S.1951 § 959], to permit the withdrawal of the record or case-made for the purpose of including therein matter omitted therefrom and which is of record in the court from which the appeal was taken, but such a withdrawal will be permitted only where it is made to appear that the matter sought to be included in the record or case-made is of record in the court from which the appeal was taken."

It will be noted that the rule there announced requires that the matter sought to be included must be both omitted matter *and* of record. This is a patently erroneous construction of the statute. The statute authorizes corrections so as to include "any matter which is of record" which is omitted from the case-made, "*or* other matter (which) is omitted" from the case-made.

In Seibold v. City of Muskogee, 155 Okl. 81, 8 P.2d 35, we said, in an opinion written by Justice Andrews who also wrote the opinion in the Alexander case, that "or other matter omitted" referred to other omitted matter not *required* to be of record in the trial court, and that the case-made could be withdrawn to include such matter though not of record, but re-affirmed the rule announced in the Alexander case as to matters which *are required to be of record.*

We think the interpretations placed on the statute in the Alexander and the Seibold cases are erroneous. The use of the disjunctive "or" in front of the words "other matter" clearly shows an intent to include all other matters which were omitted from the case-made, and necessarily refers to matters other than those which are of *record*. The conclusion that we can only permit corrections to show omitted matters not of record, if such matters were not required to be of record, can only be supported by reading into the statute considerable language which it does not contain.

The basic error of the Alexander and Seibold cases results from the erroneous assumption that an order overruling motion for new trial which is to be entered on the journal of the court is ineffective if not so entered. In the Seibold case the court expressly so declared by way of justifying or explaining the rule announced in the Alexander case, citing Carson v. State ex rel. Dudley, 137 Okl. 153, 278 P. 392. The cited case does not hold an order to be void merely because it is not entered on the journal. It, like Lillard v. Meisberger, supra, merely holds that the evidence of such order must be before this court before we can review the judgment.

In Cope v. Dancy, 99 Okl. 43, 222 P. 987, we held that the case-made could be withdrawn to show an order which was not on file and not of record at the time we made the order permitting correction, though it had been signed prior to such time.

In Bettis v. Cargile, 23 Okl. 301, 100 P. 436, it was held that 12 O.S.1951 § 959, did not authorize this court to begin proceedings to correct the trial court's record, (to show something not of record) nor to have Nunc Pro Tunc orders made in that court, as this should be done by the trial court. However, in Werfelman v. Miller, 180 Okl. 267, 68 P.2d 819, we held that we did have authority to order a correction of the trial court's record by order Nunc Pro Tunc, and that this authority stemmed from 12 O.S.1951 § 959. In such case the trial court sits as a special master.

After the Alexander case we decided Russell v. Motor Mortgage Co., 154 Okl.

49, 6 P.2d 820. In that case we, in effect, overruled the Alexander case in that we permitted a case-made to be withdrawn for the purpose of including therein an order overruling a motion for new trial which was not shown on the journal of the court, and had not been filed in the case.

■ It is readily apparent that there is a lack of harmony in our decisions on the question of whether a case-made may be withdrawn to include therein orders which do not appear of record in the trial court. As hereinabove pointed out, we think a proper interpretation of the statute authorizes this court to permit withdrawal for the purpose of including any matter omitted from the case-made without regard to whether such matter is of record or not, or as to whether it is a matter required to be of record.

■ Defendant argues that even if all omitted matter may be shown by correction to the case-made, nothing can be omitted unless it was in existence, and that the order here involved was not in existence, because it had not been reduced to writing. In Werfelman v. Miller, supra [180 Okl. 267, 68 P.2d 820], we said:

"A judgment is rendered when pronounced by the court, and the journal entry is only a record thereof."

The above language was used to explain and justify the power of a court to correct its orders and judgments by orders Nunc Pro Tunc, and is in fact the basis of such power. If the written journal entry were the judgment or order rather than only evidence thereof, it could not be changed by the simple expedient of a Nunc Pro Tunc order.

In Hines v. Armstrong, 182 Okl. 344, 77 P.2d 671, 673, appears the following language:

"On September 21, 1936, the parties signed a stipulation to the effect that the case as served was in all respects correct. On the following day, September 22, without further notice, it was presented to the court for settlement, at which time an order overruling motion for new trial was *prepared* and inserted therein. The order was based upon and included all the matters contained in the aforesaid minutes, including the date.

"It is not denied that the order overruling motion for new trial was valid, and related back to the date of the pronouncement of judgment on said motion. *The written judgment or journal entry is only the record thereof. * * *.*

"It is the duty of the trial judge to incorporate in the record for appeal all orders and other matters essential to a proper casemade. Friar v. McGilbray, 45 Okl. 597, 146 P. 581. The order in question was an essential part of the record. *Had the casemade when filed here not contained the order, on timely motion it could have been withdrawn and corrected to include such order under section 535, O.S.1931, 12 Okl.St.Ann. § 959.* Defendant's legal rights were not prejudiced by the inclusion of the order, and defendant's motion to dismiss the appeal is again overruled." (emphasis ours)

See also Taliaferro v. Batis, 123 Okl. 59, 252 P. 845; Adamson v. Brady, 199 Okl. 55, 182 P.2d 748; Mabry v. Baird, 203 Okl. 212, 219 P.2d 234; Blesch v. Blesch, 204 Okl. 426, 230 P.2d 723. See also Smith v. First National Bank of Eldorado, Ark., 169 Okl. 90, 36 P.2d 27, 28, wherein it is held in the sixth paragraph of the syllabus as follows:

"The validity of a judgment does not depend upon the formal signature of the judge to the journal entry."

Of course the written record of the order or judgment to which the court affixes its signature is authentic evidence of the judgment, but no more. In the present case the order was in existence but the evidence of same was omitted.

■ We think the proper rule in cases of this nature should be as follows:

If the case-made contains a clerk's minute or a reporter's transcript purporting to show that a judgment or order has been made, or if a verified application to withdraw the case-made is filed in this court containing an averment to this effect, this court may permit the case-made to be withdrawn. If the judgment or order has been made the trial court should then supply authentic evidence of same. Former expressions of this court at variance with the above stated rule are overruled.

■ Plaintiff finally contends that even if the rule above announced is correct, this appeal must nevertheless be dismissed for the reason that the corrected case-made was not served on him, nor was he given notice of settlement. In Russell v. Motor Mortgage Co., supra, after the case-made had been corrected by showing the order overruling the motion for new trial, the plaintiff in error failed to have the case-made as corrected authenticated or verified in any way and failed to serve it on the defendant in error. The court said:

"The purported transcript of the proceedings and testimony taken is not certified by any person, neither are the proceedings and record verified, authenticated, or certified by the court clerk, nor certified, settled, and signed by the judge of the trial court. The purported amendment or correction is nothing more than a typewritten recital of what was done, and without verification of any kind. The case-made with the correction or amendment attached was not served on the defendant and not refiled in the trial court, and neither does it bear any filing mark in this court. * * *.

"Under the state of the record, the amendment to the case-made is a nullity, and the record in this case is as originally filed." [154 Okl. 49, 6 P.2d 821.]

In Werfelman v. Miller, supra, we held that it was not necessary to refile the record in the trial court or this court. We need not decide if all of the above steps are necessary. We do observe, however, that in the case at bar the amendment was authenticated by the reporter, certified by the trial judge, and refiled in the trial court and in this court. At the conclusion of the hearing on the application for correction of the case-made by order Nunc Pro Tunc the following exchange took place between the court and Mr. Watson, attorney for plaintiff, and Mr. Shepherd, attorney for defendant:

"Mr. Watson: May we make one other request at this time? Is the court and/or the court reporter to have custody now of the case-made?

"The Court: I presume it has to be given to the court reporter.

"Mr. Watson: That would be our request.

"The Court: And I presume this will be placed in the back portion beyond the certificate and a new certificate issued in conformity with what took place here today.

"Mr. Shepherd: Yes, sir, I don't see any reason or need of any settlement.

"The Court: I will have that incorporated in there, too."

Nothing further was said as to service settlement or disposition of the case-made. Plaintiff does not now contend that the corrected portion of the case-made is erroneous (other than that it shouldn't have been corrected at all) or deficient in any respect. If service and notice of settlement was necessary, we are of the opinion that plaintiff has waived same.

We now turn to the merits of this action. Plaintiff claims that he is entitled to recover from the defendant Oklahoma Turnpike Authority on one or both of two grounds as follows: (1) That defendant was negligent in permitting Reno to enter the turnpike in an intoxicated condition; (2) that defendant was negligent in failing to employ sufficient men and means to

protect its patrons from violence on the part of other persons on the turnpike.

Both the plaintiff and Barbara Reno paid for and were issued tickets to drive on the turnpike. Plaintiff entered the turnpike at the Oklahoma City interchange. Reno entered at the Chandler interchange. The accident happened approximately two miles west of the Sapulpa gate.

Plaintiff and witnesses in two other cars testified that they observed the Reno car prior to the accident, and that it was being driven in a reckless and erratic manner. The testimony of these witnesses might also have been sufficient to constitute circumstantial evidence that Barbara Reno was drinking intoxicating beverages *after* she entered the turnpike.

The trial court overruled defendant's demurrer to the evidence and motion for directed verdict, and permitted the case to go to the jury on the two questions hereinabove set forth, and the jury returned a verdict for plaintiff.

69 O.S.1951 § 653, provides that the Turnpike Authority shall be liable for personal injuries or property damages caused by it through its negligence or the negligence of its servants.

Defendant does not contend that it would not be liable if it knowingly permitted an intoxicated driver to enter the turnpike. Its sole argument in this respect is that there was a total lack of evidence tending to establish such fact. We agree. Assuming that the testimony of plaintiff and his witnesses was sufficient to constitute circumstantial evidence that Reno was drinking intoxicating beverages *after* she entered the turnpike, there was neither direct nor circumstantial evidence tending to show that Reno was intoxicated at the time she was admitted through the toll gate. The attendant on duty at the Chandler interchange testified that there was nothing abnormal in her behavior or in what she said that would cause him to suspicion her. Two of plaintiff's witnesses testified that the first time they saw the

Reno car there was nothing unusual in the manner in which it was being driven. The attendant did testify that Miss Reno told him she had stopped at a filling station and asked directions to the turnpike and "The filling station man had told her to 'stay off the d— turnpike and take 66', and she had replied to that, said 'I found it anyway'." Plaintiff argues that this, together with the fact that there was a man lying down in the back seat of the car should have incited the toll gate attendant's curiosity. If the filling station man told this driver to travel on Highway 66, rather than the turnpike, he was undoubtedly motivated by consideration of matters other than her driving ability. Furthermore there is no proof that Reno was intoxicated; therefore, there is no basis for assuming that an investigation would have so revealed.

Plaintiff contends that even if there was no evidence tending to show that defendant was negligent in permitting an intoxicated driver to enter the turnpike, there was yet another question for the jury as to whether the turnpike authority employed sufficient men and means to protect its patrons from violence on the part of others "whether drunk, crazy or just indifferent and reckless." Plaintiff relies on a line of cases holding that one who solicits public patronage of an enterprise which he conducts on his premises owes to an invitee the duty to use reasonable care to protect him from the acts of a third person. Many of these cases are annotated in 20 A.L.R.2d 8, 29 A.L.R. 2d 911, and 42 A.L.R.2d 1103. See also 162 A.L.R. 959. The common law rules of liability on this question are not controlling for the reason that the Legislature has, to a substantial extent, relieved the Turnpike Authority from its duties in this respect.

69 O.S.1951 § 666, originally enacted in 1947, and re-enacted without change in 1953, provides as follows:

"Each turnpike project when constructed and opened to traffic shall be

**1088**

maintained and kept in good condition and repair by the Authority. Each such turnpike project shall also be *policed* and operated by such force of police, toll-takers and other operating employees as the Authority may in its discretion employ. * * *." (Emphasis ours.)

69 O.S.1957 Supp. § 692, enacted in 1953, provides as follows:

"Enforcement of both traffic laws and the general laws of the State of Oklahoma on Turnpikes shall be the *exclusive responsibility* of the Department of Public Safety, and the cost thereof shall be borne by the Oklahoma Turnpike Authority. Provided that the Authority shall be liable only for such costs as may be agreed to by it under contract or agreement with the Commissioner of Public Safety." (Emphasis ours.)

If it can be argued that these two sections are inconsistent, we are of the opinion, and plaintiff admits, that the last quoted section is controlling insofar as it places the exclusive responsibility of *enforcing* the traffic laws and the general laws upon the Department of Public Safety. But plaintiff contends that it does not purport to relieve the Authority from its common law duty to affirmatively provide a sufficient number of guards on duty at a given time, and in a particular area, and if necessary to employ personnel other than the Highway Patrolmen to act as guards or observers.

■ In the present case the conduct which created the dangerous condition was the reckless driving by Reno. Reckless driving is a direct violation of the Uniform Traffic Code, 47 O.S.1951 § 121.3(j). Therefore the dangerous acts from which plaintiff claims he should have been protected were acts which the Highway Patrol had the exclusive responsibility to prevent.

■ Since the Legislature has charged the Highway Patrol with the exclusive duty of preventing (by enforcing the law) reckless driving on turnpikes, we think it follows as a matter of law that the defendant was relieved from employing other personnel or means to prevent reckless driving or other traffic violations.

■ Plaintiff also argues that defendant should have caused more Highway Patrolmen to be on duty at the time and place in question. The Department of Public Safety is eminently qualified to determine the number of patrolmen required to provide adequate protection in law enforcement on this stretch of highway, and defendant was entitled to assume that they would assign, or suggest the assignment of, a sufficient number to accomplish such purpose. However, in this connection, plaintiff contends that defendant and not the Department of Public Safety had the discretion of determining the number of Highway Patrolmen that would be assigned to the turnpike. We do not agree.

69 O.S.1957 Supp. § 693, provides that the Authority shall pay the Department of Public Safety for the use of equipment assigned to the turnpike, as well as the salaries of the police personnel so assigned at such rates as agreed to by the Department and the Authority. Sec. 692 provides that the Authority shall be liable only for such costs as are agreed upon. It appears that the Authority could not be forced to pay for a greater number than agreed upon because the bonds were issued pursuant to Sec. 666 of the 1947 Act which provided that the expenses to be incurred for policing would be discretionary with the Authority. But Secs. 692 and 693 do not relieve the Department of Public Safety of its primary duty to patrol the turnpike and enforce the law thereon.

■ Of course the Authority still has the duty of agreeing to pay the expenses for the patrolmen and equipment which the Department reasonably deems necessary. It may be that if it were proved the defendant affirmatively refused to pay the

expenses for a greater number of vehicles and patrolmen than were assigned on the day of the accident that a question for the jury would be presented as to whether the number assigned was adequate. Plaintiff proved that there were sixteen patrolmen assigned on the day of the accident. Since the Department of Public Safety has the exclusive responsibility of enforcing the law, it was also its primary and non-delegable duty to determine the number of patrolmen to be assigned and their method of operation. Therefore, unless it were first proved that the defendant would not agree to pay for the number which the department considered necessary, and thereby encouraged the department to violate its duty, the defendant could not be liable by reason of any insufficiency in the number of Highway Patrolmen. In our opinion the trial court erred in failing to sustain defendant's demurrer to the evidence and its motion for a directed verdict.

The judgment is reversed and the cause is remanded with directions to render judgment in favor of defendant.

DAVISON, C. J., and WELCH, HALLEY, JOHNSON and IRWIN, JJ., concur.

WILLIAMS, V. C. J., and BLACKBIRD and BERRY, JJ., dissent.

BERRY, Justice (dissenting).

I am unable to concur in the majority opinion on the merits.

The basic question on the merits is whether under all the facts the jury was entitled to conclude that the Oklahoma Turnpike Authority, hereafter referred to as "Authority", failed to exercise ordinary and reasonable care in permitting Barbara Reno, hereafter referred to as "driver" to come upon the Turner Turnpike, hereafter referred to as "turnpike", and/or to use said turnpike after being admitted thereto.

Driver and her two male companions applied for permission to use the turnpike at one of the entrances thereto near Chandler, Oklahoma. The agent for turnpike who issued driver a "ticket" which evidenced driver's privilege to use the turnpike, testified that one of driver's male companions who was seated in the front seat of the automobile next to driver "was sitting there and spoke no words"; and that the other male companion was "laying down in the back" and that he didn't know whether he was conscious or unconscious. The agent testified further that driver stated that a filling-station operator had told her to stay off the turnpike and that driver told the agent "I found it any way".

Was the jury justified in finding that the foregoing facts were sufficient to place Authority on notice that driver and her male companions were probably under the influence of liquor or drugs and that driver's operation of the automobile upon the turnpike would probably endanger the lives, limbs and property of those using said turnpike, or did it put Authority on notice that while driver could possibly operate the automobile well enough at the time she entered upon the turnpike, she and her companions should be kept under surveillance in order to learn if the silent man might suddenly come to life and become very interested in those around him, or the reclining man who was possibly unconscious might suddenly become conscious and otherwise physically active, or if driver who experienced trouble in locating the turnpike might experience trouble in properly driving the automobile down it once she gained entrance thereto? I submit that this question must be answered in the affirmative.

Over a period of some two hours following driver's admission to the turnpike, these things occurred while driver and her companions traveled approximately 47 miles:

Plaintiff testified that driver passed his automobile so close that he pulled over to avoid being side swiped; that driver cut in front of his automobile immediately

upon passing and he thought that driver would smash his left front fender; that a hat from a man occupying driver's automobile blew off and driver didn't stop so that the hat could be retrieved; that driver's car later struck defendant-in-error's automobile from the rear at a time when plaintiff was driving 60 miles an hour. A witness testified that driver passed his automobile at a high rate of speed, then slowed down and after he passed driver's automobile, driver passed witness's automobile going fast and she was "laying right on the horn all the time that she was going around him"; that a man was slouched down in the back seat; that driver was "driving wide open", that the next time he saw driver she was stopped along turnpike; that he then "sped up and tried to hold the speed limit as best he could to get away from driver"; that his boys watched driver's automobile through field glasses; that he witnessed driver's automobile collide with plaintiff's automobile; that witness thought driver was going to hit the "boulevard" when she went around him; that she was "laying on the horn and she was laughing" and he thought "something was wrong because (driver) drove so fast"; that witness saw driver parked and one of the doors of her automobile was open. Another witness testified that he saw driver's automobile in a ditch; that driver passed his automobile several times; saw a person drinking out of a bottle "that looked like a whiskey bottle"; that he saw "them" drink as they drove; that the man in the front seat had a bottle; that driver and the man in the front seat took a drink; that "they were dangerous to the highway and everybody"; that driver drove very close to his automobile. Another witness testified that he saw driver "kinda parked in the ditch"; that he saw "them" drinking. Another witness testified that because of the manner in which driver operated her automobile he watched it through binoculars; that driver was driving at a high rate of speed. Another witness testified that after observing driver's antics she "drove about 70 from then on trying to get away from her because I didn't want to encounter her any more". The witnesses who saw driver on the turnpike were in accord on the proposition that driver drove her automobile in a wantonly reckless manner.

Was the jury justified in finding, as it no doubt did, that driver and her companions were under the influence of intoxicants or drugs and that their presence upon turnpike jeopardized the lives, limbs and property of others using turnpike? I submit that this question must also be answered in the affirmative.

I am of the opinion that Authority is charged with the duty of exercising ordinary or reasonable care in screening its prospective patrons and in not admitting to turnpike a person who, because of intoxication, mental derangement or an openly-manifested disregard of the right of others may possibly endanger the lives, limbs and property of others using the turnpike and that it is also charged with the exercise of said degree of care in learning of the presence of a patron on or using the turnpike whose condition due to intoxication, mental derangement or an openly-manifested disregard for the rights of others may endanger the lives, limbs and property of others and that the Authority is negligent when it fails to exercise said degree of care.

76 O.S.1951 § 5 reads as follows:

"Every one is responsible, not only for the result of his wilful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, wilfully or by want of ordinary care, brought the injury upon himself."

In Denco Bus Co. v. Keller, 202 Okl. 263, 212 P.2d 469, 473 this court pointed out that " 'ordinary care,' in law, at least, means the same as 'due care' or 'reasonable care' ".

At p. 674, 38 Am.Jur. "Negligence", the author points out that "both ordinary care and reasonable care means due care".

Sherman & Redfield have this to say in Vol. 2, Sec. 377, p. 940 of their work on "Negligence":

"In consideration of the right to collect such tolls, the proprietors of the road undertake to exercise ordinary care and diligence in keeping it in such a state of repair that it may be traveled with safety to life and property."

Driver's mental and physical condition both before and after entering upon the turnpike can be shown by circumstantial evidence. In Beatrice Foods Co. v. Jennings, 206 Okl. 688, 690, 246 P.2d 347, 349, this court stated "that negligence may be established by circumstantial evidence and the reasonable inferences to be drawn therefrom, and that where the evidence was such that reasonable men might draw different conclusions therefrom, it was a question for the jury." Casualty Reciprocal Exchange v. Sutfin, 196 Okl. 567, 166 P.2d 434; Mid-Continent Pipe Line Co. v. Price, 203 Okl. 626, 225 P.2d 176 are cited in support of the quoted statements.

If Authority was under the duty to exercise ordinary and reasonable care to learn of conditions on the turnpike and learn if conditions existing thereon were dangerous and hazardous to its patrons, and I am of the opinion that it was, knowledge of a dangerous and hazardous condition can be imputed to it.

The following will be found at pp. 352–354, 65 C.J.S. Negligence § 5:

"The knowledge or notice of defect or danger which is necessary in order to impose liability for negligence need not be actual, and implied, imputed, or constructive knowledge or notice is sufficient. Negligently remaining ignorant of that which it is one's duty to know has the same effect as actual knowledge, and in such case one is said to have implied or constructive notice or knowledge, and, where knowledge is necessary to careful conduct, voluntary ignorance is equivalent to negligence."

"* * * where a person is under a duty to know of, or to discover, a defect or danger, and could discover it by the exercise of due, ordinary, or reasonable care of diligence, and the condition has existed for a sufficient time to have enabled him to discover it, knowledge or notice thereof is imputed to him as far as the question of his negligence is concerned, or, what amounts to the same thing in practical effect, his failure to discover the defect or danger is regarded as negligence, or will not excuse him from liability."

At page 365 of the last above-cited authority, the author has this to say:

"What constitutes sufficient time to discover a defect or danger must depend on the circumstances of each case, and a reasonable time is afforded."

In Galveston, H. & S. A. R. Co. v. Bell, Tex.Civ.App., 165 S.W. 1, 2, affirmed 110 Tex. 104, 216 S.W. 390, the court had this to say:

"It was not necessary that appellant should or could have foreseen the occurrence as it really happened. 'If a drunken and disorderly man is on the carrier's vehicle, it will not do to say, after a passenger has been subjected to insult or injury, that the carrier's servants did not know or could not have foreseen that the particular individual who was insulted or injured was in danger of such insult or injury, if they were apprised, or with proper care could have known, of circumstances which indicated that someone would be injured, unless the disorderly passenger or stranger were ejected or controlled.'"

It is apparent that the nature of business conducted on property has a direct bearing on whether a proprietor has exercised ordinary or reasonable care in learning of the dangerous tendencies of a person on

his property and in taking steps to protect others who are on his property from the acts of said person. In a small roller skating rink a person whose actions indicate a disregard for the rights of others can be quickly and easily detected. In a large stadium detection would not be as easy. On a turnpike it would be more difficult. However, where a person over a two-hour period engages in the antics that driver and her companions engaged in from near Chandler to near Sapulpa, a relatively short distance, the matter of whether Authority used ordinary and reasonable care in learning a driver's lack of ability to properly operate the automobile that she was attempting to operate and whether it took steps to prevent driver from becoming involved in a traffic accident such as notifying the Department of Public Safety, hereafter referred to as "Highway Patrol" of driver's action is a question of fact for the jury.

At page 17, 20 A.L.R.2d, the authors of the annotated notes, beginning on said page, introduce said notes with this observation:

"It is well settled that the proprietor of a business establishment owes a duty to his customers and patrons to exercise reasonable, ordinary or due care to keep his premises reasonably safe for their use. This liability includes affirmative acts of negligence and also dangerous conditions which the proprietor could have known of in the exercise of due care. In other words, the proprietor must exercise due care to avoid injuring customers, and take such precautions as a man of ordinary prudence would observe under the circumstances, and must, therefore, maintain the premises in such a way that they will be reasonably safe for customers."

At page 21, 20 A.L.R.2d of the above-referred to annotated notes the annotator states that:

"The dangerous condition of the premises against which the proprietor

of a business establishment has the duty to protect his customers includes the acts of third persons, and, more particularly, the acts of other customers."

The first paragraph of 69 O.S.1951, § 666, reads as follows:

"Each turnpike project when constructed and opened to traffic shall be maintained and kept in good condition and repair by the Authority. Each such turnpike project shall also be policed and operated by such forces of police, toll-takers and other operating employees as the Authority may in its discretion employ."

When the last above-quoted language and the language of 69 O.S.Supp. '53, § 692, to the effect that "Enforcement of both traffic laws and the general laws of the State of Oklahoma on Turnpikes shall be the exclusive responsibility of the Department of Public Safety" are considered, one is forced to the conclusion that the Legislature in effect created a contract between Authority and the Highway Patrol to the effect that the latter should have the primary duty of policing the turnpike. If Authority had directly entered into the contract this would not serve to absolve it from negligence because Authority's duty to exercise ordinary and reasonable care in its operation of the turnpike is a non-delegable duty.

At p. 42, Sec. 19, Vol. 1, Sherman & Redfield "Negligence", the authors have this to say:

"One who is personally bound to perform a duty cannot relieve himself from the burden of such obligation by any contract which he may make for its performance by another person.

"Therefore, the fact that he may have used the utmost care in selecting an agent to perform this duty, or that he has entered into a contract with any person by which the latter undertakes to perform the duty, is no excuse to the person upon whom the obligation originally rested, in case of failure of performance. His obliga-

tion is to do the thing, not merely to employ another to do it."

In Dagley v. National Cloak & Suit Co., 224 Mo.App. 61, 22 S.W.2d 892, 895, a Kansas City Court of Appeals has this to say:

"We fully agree that the advertising company was an independent contractor. But a storekeeper may not relieve himself of the duty to use reasonable care to keep his premises in a reasonably safe condition for the use of his invited customers and his prospective customers by contracting with others and relying upon them to take the necessary precautionary measures. 45 C.J. 880; Pooler v. Sargent Lumber Co., 113 Me. 426, 94 A. 754, L.R.A.1915F, 1125; Golson v. W. F. Covington Mfg. Co., 205 Ala. 226, 87 So. 439; Pitcher v. Lennon, 12 App. Div. 356, 42 N.Y.S. 156; Coeur d'Alene Lumber Co. v. Thompson, 9 Cir., 215 F. 8, L.R.A.1915A, 731."

Any suggestion that Authority should not be treated the same as any other tort feasor and therefore without right to delegate its duty to exercise ordinary and reasonable care in policing turnpike is, in my opinion, dispelled by the provisions of 69 O.S.1951 § 653 to the effect that the fact that Authority is declared to be a state instrumentality "shall not be construed to relieve said Authority from liability for personal injuries or property damages incurred by it through its negligence or the negligence of its servants or agents, and in addition thereto it shall be subject to Workmen's Compensation Laws of the State the same as a private construction project." It is patent that if Authority in the instant case is permitted to delegate its duty to exercise ordinary care, it is not made responsible for its negligence, and the language of Sec. 653 is in part struck down.

If it be assumed that the Highway Patrol had exclusive authority to police turnpike, this would not render Authority free of negligence if it permitted a person who

was not normal as a result of intoxication or other causes, whether the causes be natural or unnatural to enter upon the turnpike, because Sec. 692, supra, only applies to the turnpike proper and not to its approaches. In brief, turnpike's agents and not the members of the Highway Patrol issue tickets and admit persons to the turnpike. In my opinion, the provisions of Sec. 692, supra, would not relieve Authority from notifying the Highway Patrol of dangerous and hazardous conditions upon the highway brought about by a person using same. It is a matter of common knowledge that a proprietor of an establishment usually calls upon peace officers to control an unruly patron instead of undertaking to control the patron himself, and the jury in the instant case probably thought that Authority should, in the exercise of ordinary and reasonable care, have taken this step.

It is the public policy of this State to maintain order and protect lives, limbs and property, which policy is in part developed by the provisions of Title 22 O.S.1951 §§ 187, 202 and 204 under which a private person is authorized to make arrests and if the person sought to be arrested has committed a felony, a private person may break open an outer or inner door or window of a dwelling house for the purpose of making an arrest. See also by Title 21 O.S.1951 Sec. 537, a private person, following an officer's request for assistance, is guilty of a misdemeanor if he fails to assist an officer in making an arrest.

I am of the opinion that the Legislature, in enacting the Turnpike Authority Act, did not intend to change the public policy of this State as applied to turnpikes over which automobiles travel at 70 or more miles per hour, and that the Legislature, to the contrary, intended that law and order be maintained on turnpikes through the cooperation of the agents of the Authority, private persons, peace officers and Highway Patrol. I am of the further opinion that the Legislature's intent in enacting the statute relied upon by the plaintiff

in error was to make available to Authority (at Authority's cost) the trained personnel of the Highway Patrol. It is provided in Sec. 666, quoted supra, that Authority shall be "operated by such force of police * * * as the Authority may in its discretion employ." This language makes clear that the number of Highway Patrolmen used in policing the turnpike rests in the discretion of Authority and not in the Highway Patrol. Therefore, if the damage sustained by defendant in error resulted directly from an insufficient number of Highway Patrolmen being available on the turnpike at the time the accident occurred, this is chargeable to Authority and not the Highway Patrol.

The legislative plan to make the services of the Highway Patrol available to Authority is comparable to the plan created by ordinances of making trained policemen available to control traffic and perform other police work in the city enacting the ordinance, and is also comparable to the legislative plan (19 O.S. 1951 § 516), under which sheriffs are charged with the duty of preserving peace and order in their respective counties.

To my knowledge no one has ever seriously suggested that the fact that peace officers, which would, of course, include Highway Patrolmen, are specifically charged with the duty of controlling traffic and performing other necessary police work, absolves a private proprietor of the duty of exercising ordinary and reasonable care in protecting his patrons from the acts of another patron where the proprietor knows or under the facts is charged with knowledge, that protection should be extended, and no reason appears to me why in the instant case Authority should be permitted to, in effect, successfully assert that if any entity was negligent in not properly policing turnpike it was the Highway Patrol and not it.

For the reason herein stated, I respectfully dissent.

I am authorized to state that BLACK-BIRD, J., concurs in the foregoing views.