**NATIONAL TRAILER CONVOY, INC.,**
a Corporation, and Oklahoma Turnpike
Authority, Plaintiffs in Error,

v.

Ila Rosalee SAUL, Administratrix, of the
Estate of Dean Thomas Saul, Deceased, Defendant in Error.

No. 39498.

Supreme Court of Oklahoma.

July 17, 1962.

Rehearings Denied Sept. 11, 1962.

Butler, Rinehart & Morrison, Oklahoma City, and Gable, Gotwals & Hays, Tulsa, for plaintiff in error, National Trailer Convoy, Inc., a Corp.,

Looney, Watts, Looney & Nichols, Oklahoma City, Covington & Gibbon, Tulsa, for plaintiff in error, Oklahoma Turnpike Authority.

**924**

Witherspoon, Aikin, Thomas & Langley, Earnest L. Langley, Hereford, Tex., Rucker, Tabor, Best, Sharp & Shepherd, Truman B. Rucker, Joseph M. Best, Joseph A. Sharp, O. H. "Pat" O'Neal, Tulsa, for defendant in error.

BLACKBIRD, Vice Chief Justice.

The defendant in error is the surviving widow of Dean Thomas Saul, who was fatally injured in his sedan's collision with a ¾-ton "bob tail" Chevrolet truck, on the Will Rogers Turnpike, after midnight and early in the morning of November 27th, 1958. The truck, having double rear wheels, and being of the type commonly used for pulling trailers, and referred to as a "tractor", was stopped on said Turnpike, with its lights turned off, and without a proper signal, or flare, to warn motorists of its presence. In the cab of the truck was its driver, Alva Milo Wix, who had stopped it there, after using it to pull a trailer, belonging to National Trailer Company, Inc., to Abilene, Texas, from said Trailer Company's establishment in Tulsa, under a one-year "Lease" contract Wix had, more than a month before, or on October 11, 1958, entered into with said company.

When defendant in error, as plaintiff, thereafter instituted this action in July, 1959, for her intestate's wrongful death, she named both Wix and National Trailer Convoy, Inc., as defendants, and later made the Oklahoma Turnpike Authority, operator of the turnpike, an additional defendant. As Wix, who hastily drove the tractor away from the scene of the accident, within moments after it occurred, some time later the same morning, was awakened in the cab of the truck, parked in the parking area of a Howard Johnson restaurant and Phillips Service Station on the turnpike, and plaintiff alleged he was drunk when he had previously stopped it on the turnpike and caused the accident, she sought recovery against National Trailer Convoy, Inc., (hereinafter referred to merely as "National") on the alleged theories of both

respondeat superior, and negligent entrustment. She sought to make Oklahoma Turnpike Authority (hereinafter referred to as the "Turnpike Authority" or "Authority") also liable for the accident, and the resulting damages, on the theory that it, through its Toll Gate Attendant at the Claremore Interchange, was negligent in allowing Wix to drive the truck onto the turnpike in an intoxicated condition, and/or in not taking measures to prevent the accident after Wix drove the truck, or tractor, inside the turnpike gate.

At the trial of the case, the court overruled motions for directed verdicts by both National and the Authority, and, upon submission of the cause to the jury (which answered certain written interrogatories in plaintiff's favor) a general verdict was rendered against all three defendants. After judgment was rendered accordingly, and separate motions for a new trial, filed by National and the Authority, were overruled, those two defendants perfected the present appeal.

None of the propositions submitted in the arguments herein include, or comprehend, any question as to the negligence of the truck driver Wix, or any question as to said negligence being a proximate cause of plaintiff's intestate's death, and the resulting damages. Accordingly (although Wix' name is printed on one of the briefs as a defendant in error) those matters are settled by the verdict and judgment.

The gist of National's position on appeal is that the evidence in this case was insufficient for determination of any liability on its part for Wix' negligence, whether on the theory of respondeat superior, or negligent entrustment, or both. Said Company calls attention to evidence indicating that Wix owned the "pick-up", or pulling, tractor, or truck, and to the fact that no chattel belonging to it was involved in the accident, which occurred when the only part of the truck-trailer combination owned by it (to-wit: the trailer), had already been delivered in Texas, and to evidence indicating that it did not, at least as to some par-

ticulars, direct the manner in which Wix carried out the assignments it gave him for transporting its trailers under the parties' contract, or arrangement, with each other. National contends that, at the time of the accident, *all* of its business with Wix had been concluded; and part of its argument as to the trial court's alleged error in overruling its motion for a directed verdict, is based on the hypothesis that, in view of the evidence, there could be no question but that Wix was, at that time, outside, or beyond, the scope of his employment as National's agent. National's brief mentions, but attaches no significance to, the fact that when Captain Reese, of the Oklahoma Highway Patrol, found Wix asleep in the cab of his truck some time after the accident, he still had in his possession the rental money he had collected, on behalf of National, from its customer in Abilene, as rent on the trailer he delivered there.

As far as the evidence shows, no release, or dismissal from the hauling assignment, had been obtained by Wix from any officer, or employee, of National, but this, and Wix' retention of its aforementioned funds, is explained by the fact that he did not reach Tulsa until long after National's office there had closed for the night. It was established at the trial, however, that shortly after Wix was bailed out of the county jail in Claremore (where he was taken by Captain Reese) the next morning, he returned to Tulsa, where he turned the rental money into National's office (which had then re-opened for another day's business) and "checked in" with its Mr. Edmondson.

As further supporting its position that, when the accident occurred, Wix was on what it terms a "frolic" of his own, rather than on any mission, or business, for it, National cites the fact that, when Wix, apparently en route from his delivery assignment to his home in Claremore to spend the rest of the night, drove out of the turnpike gate at the Claremore interchange, he turned the truck around, drove back through the toll gate toward Tulsa, but,

after the accident, was found in the aforementioned parking area a mile and a half, or more, from the gate, toward Vinita. Wix testified, in substance, that the reason he did this was that he had changed his mind about going home to sleep, because he happened to remember his wife's opposition to his drinking, and was also afraid he might have trouble with the Claremore "cops", so he decided to drive to a place along the turnpike, where he could park the truck and sleep in it until morning, before going home.

■ National's liability, as Wix' principal, for his negligence in causing the collision does not depend on a master-servant, or employer-employee, relationship between the two. Assuming that, in his relationship to National, Wix' status was no more than that of an independent contractor, would not necessarily relieve National of liability for his negligence, if it engaged him in work that was inherently dangerous. See 27 Am.Jur., "Independent Contractors", sections 28, 30, 35, 39, 48, 49, and the Annotations beginning at 8 A.L.R. 2d 267. Although an automobile or truck may not, in itself, be considered a dangerous instrumentality by the courts generally, or for all purposes, (35 Am.Jur., "Master & Servant", sec. 547) we have found no dissent to the view that hauling by either kind of a motor-propelled vehicle, operated by a drunk driver, is an inherently dangerous undertaking. See Brady v. B. & B. Ice Co., 242 Ky. 138, 45 S.W.2d 1051, 1052, 1053. Here, however, Wix was not engaged (as an independent contractor) in an ordinary private business. His hauling for National was in interstate commerce, by reason of which certain duties of the contracting parties to the public are defined and regulated by the Interstate Commerce Commission (in this connection, notice 35 Am.Jur., supra, sec. 549). Thus, in the leading case of Hodges v. Johnson, (D.C., W.D., Va.) 52 F.Supp., 488, 490, the court said:

"* * * public policy requires that the holder of a franchise or certificate

from the Interstate Commerce Commission for the operation of freight vehicles in Interstate Commerce upon the public highways be held responsible for the operation of such vehicles under said franchise, or certificate, by independent contractors of such certificate holders, * * *. Otherwise, the public might be entirely deprived of safeguards to the public required by the Interstate Commerce Commission, by means of certificate holders evading their responsibility by the employment of irresponsible persons as independent contractors.

* &ast; &ast; &ast; &ast; &ast;

"From the cases cited * * * the theory seems to be that where public authority grants to an individual or corporation authority to engage in certain activities involving danger to the public, the duty to safeguard the public while performing such franchise activities, is legally nondelegable, and the franchise holder is therefore responsible for the conduct of those whom it permits to act under its franchise, even though such persons be independent contractors. * * *"

Here, Wix, in pulling National's trailers under his hereinbefore mentioned lease contract with it, did so—by specific provision of said contract—under National's Interstate Commerce Commission Certificate. The eighth paragraph of said contract (in which National is referred to as the "Carrier", and Wix is referred to as "Operator") provides:

"It is understood and agreed that, concerning the duties of the Carrier to the public in general as a common carrier, and as required by the rules and regulations of the Interstate Commerce Commission, shall be and remain the obligation and responsibility of the Carrier, and in the performance thereof concerning such obligations as are imposed by law upon a motor vehicle common carrier as provided by the Interstate Commerce Act [49 U.S.C.A. § 1 et seq.], and all rules and regulations thereunder the Carrier shall be responsible to the general public irrespective of any agreement between the Operator and Carrier herein."

In the above quoted case, as in the present one, an independent contractor, Johnson Truck Company, used one of its trucks, operated by its driver, Gilmore, to haul a load of lard from Charlotte, North Carolina, to Roanoke, Virginia, for Jocie Motor Lines under the latter's certificate and license from the Interstate Commerce Commission. The truck's accident occurred on the return trip to Charlotte, after the lard had been unloaded at its consignees in Roanoke. Consequently, at the time of the accident, the truck was empty; and Jocie, in an effort to escape liability for the driver's negligence took a position similar to that of National here, that, at the time of the accident, the truck was not in its service, because the only purpose, or mission, of the trip, to which Jocie was in any manner related, was accomplished or completed, with the unloading of the truck in Roanoke. The court rejected this argument, holding Jocie liable, on the view that the truck's return to Roanoke empty, as well as its departure from Charlotte loaded—in other words, the *whole trip*— was undertaken, and made, under Jocie's franchise. In numerous other cases involving hauling by trucks in interstate commerce, the courts have refused to excuse such carriers from liability because they were operating through independent contractors. See the impressive list of cases cited in Werner Transp. Co. v. Dealer's Transport Co., (U.S.D.C.Minn.), 102 F.Supp. 670, 671, 672. In American Transit Lines v. Smith (U.S.C.A., 6th Cir.), 246 F.2d 86, 90, 91, it was said:

"If the motor carrier cannot delegate its responsibility to an independent contractor for the period of delivering the load, neither can it delegate its responsibility for that part of the trip which necessarily must be made *after the load is delivered. It is the*

*motor carrier that has put the entire trip in motion. * * *"* (Emphasis ours).

In Mellon National Bank and Trust Co. v. Sophie Lines, Inc., (U.S.C., 3rd Cir.) 289 F.2d 473, 476, 477, it was pointed out that Turner, lessee of the truck and the licensed I. C. C. Carrier, could have effectually eliminated its responsibility for the involved truck's use under I. C. C. Rule, Section 207.4, by doing two things, one of which was:

"* * * obtaining the receipt called for by 207.4(7) (b) which latter reads: '* * * When the possession by the authorized carrier ends, it or its employee or agent shall obtain from the owner of the equipment, or its regular employee or agent duly authorized to act for it a receipt specifically identifying the equipment and stating therein the date and the time of day possession thereof is taken.' It failed to do this. * * *"

While the particular provision of I. C. C. Rule, sec. 207.4 quoted in the above opinion was not introduced into the evidence of this case (though some other parts of it were incorporated in the Court's Instruction No. 10)—and it may, or may not, be applicable—the fact that Wix was still carrying the rental money he had collected for National, was a significant one, to be considered on the issue dealt with here (see Cotton v. Ship-By-Truck Co., 337 Mo. 270, 85 S.W.2d 80, 84). Another matter entitled to consideration was the "Equipment Receipt" executed for National on the same date the "Lease" was entered into, which represents that (as of that date) the truck was being "placed in exclusive service for National Trailer Convoy, Inc." At the same time (according to the undisputed evidence) Wix, under his arrangement with National was free to, and customarily did, drive the truck to and from his home, and he drove it on National's business at any hour of the day or night he chose, with the possible exception of pulling "oversized" units with it, at night. Considering

all of the evidence as to such matters, and the further fact that Wix had not yet "checked in" with the Company off the Abilene trip, nor in any other formal, bilateral, or contractual manner terminated his engagement for National under the parties' contract, we think the evidence as a whole was sufficient to go to the jury for determination of the question as to whether or not, at the time of the accident, Wix was the agent, and still employed in business, of National, as comprehended in the parties' agreement and in the foregoing cases. (In this connection, notice Duke v. Thomas (Mo.App.), 343 S.W.2d 636, Cook v. Knox, Okl., 273 P.2d 865, 869, and 35 Am. Jur., "Master & Servant", sections 553, 555 and 559, both inclusive, and the Annotations at 52 A.L.R.2d 350, and 122 A.L.R. 858). This cause is readily distinguishable from Tulsa County Truck & Fruit Growers Ass'n v. McMurphey, 185 Okl. 132, 90 P.2d 927, where the driver undertook the hauling "on his own initiative and without previous direction by the association or any of its officers."

■ In part of its instruction No. 14, the trial judge told the jury:

"* * * it is the duty of one having custody and control of a vehicle not to allow a driver whom they know, or in the exercise of ordinary care should know, is an unfit or otherwise incompetent driver to operate such vehicle."

Under its Proposition II, National argues that this instruction was not justified by the facts. Its position seems to be that, on the basis of the undisputed evidence, it not only did not know Wix was unfit because of his drinking, to be entrusted with pulling its trailers, but that it did all that could reasonably be expected of it to determine his fitness before he was given any pulling assignments. National cites Tit. 47 O.S.1951 § 308, and the cases of Willingham v. Panick (C.C.A. 10th Cir.) 161 F.2d 614, Commercial Standard Ins. Co. v Mahan, D.C., 116 F.Supp. 76, and Greenland v. Gilliam, 206 Okl. 85, 241 P.2d 384, for the statement that: "* * * the

person to be held must *know* the operator is disqualified." (Emphasis ours). The cited statute (superseded by the Uniform Vehicle Code, whose section 20–106 repealed said section and others in Chap. 9, Tit. 47 O.S.1951. See S.L.1961, p. 424), applies, by its specific wording, to the "owner" of any motor vehicle. National did not claim to be the owner of the "bob tail" truck involved here, and, as hereinbefore indicated, the proof indicated its ownership in Wix. Nor was Wix a "not authorized" driver in the sense that term is used in the cited statute. The statute and cited cases are inapplicable. However, in the case of Berg v. Bryant, Okl., 305 P.2d 517, 519, this court, on the basis of good authority, recognized said statute as one application of the common law principle which charges " * * * one who supplies * * * a chattel for the use of another whom the supplier knows, *or should know* * * * to be likely to use it in a manner involving unreasonable risk of bodily harm to others, with liability for the harm caused thereby." (Emphasis ours). There, we also recognized the difficulty of proving knowledge, or state of mind, in the "supplier" or party, who provided the opportunity for such user; and there rejected the argument that the evidence was insufficient to show that the defendant knew the son, he permitted to drive the truck, was an improper driver, where there were circumstances from which the jury could have concluded that he *should have* known that fact. Similarly, in McCarley v. Durham, Okl., 266 P.2d 629, 632, we approved the admission in evidence of a son's previous driving record as tending to show his father should have known he was a reckless driver. Nor was the duty of such a party to inquire into the driver's qualifications overlooked in Willingham v. Panick, supra, but there the only phase of qualification involved was his lack of statutory authorization, by license, to drive; and the court thought that, as to such authorization, Tit. 47 O.S.1941 § 275, relieved the owner-defendant from ascertaining whether the driver had an Oklahoma license.

■ As hereinbefore indicated, a common carrier who engages a trucker to operate under its I.C.C. permit has the duty of seeing that the truck's driver is a competent one; and, even though the trucker may be an independent contractor, the contractee stands in the same shoes as a master, or employer, as regards such duty. Hence, his liability is governed by the doctrine of respondeat superior. If there is competent evidence tending to show that such contractee knew, or should have known, that the contractor was not such a driver, then, whether or not the contractee was negligent in discharging this duty is a question to be determined by the trier of fact, if reasonable men might draw conflicting conclusions on the matter. In this connection, see the Annotations at 8 A.L.R.2d, supra. As to this and related subjects, also notice the Annotations at 168 A.L.R. 1364, 140 A.L.R. 1150, and 120 A.L.R. 1311. In the present case, it was shown that, while pulling a trailer for National in Illinois, during August, 1957, Wix had an accident damaging the trailer; that he was then charged with, and convicted, of "Intoxicated driving"; that National was mailed written notice (which became part of Wix' permanent record in National's office) of this conviction on September 9, 1957; that Wix' Oklahoma driver's license was revoked September 17, 1957, and his employment by National terminated; that he was arrested behind the steering wheel of an automobile in his home town of Claremore on March 18, 1958, and was charged with, and paid a fine for "Public drunk"; that he did not obtain reinstatement of his driver's license until October 2, 1958, (only a few days before National entered into the involved contract with him); that he had a reputation in Claremore, where he had resided for several years, for excessive drinking; that National's "Safety Director" was a former Oklahoma Highway Patrolman, who had been stationed at nearby Tulsa, and was acquainted with almost all of the highway patrolmen, and had worked with Captain Reese; that this Safety Director was out of the State when Wix'

last contract with National was entered into, and some of National's officers and/or employees talked to Wix about drinking; that nevertheless National made no inquiry in Claremore concerning Wix' police record there, nor investigation as to his conduct, or reputation for drinking, during the year his driver's license had remained revoked. We deem it unnecessary to detail, or to elaborate, upon all of such evidence. There can be no doubt that it tended to show National either knew, or by reasonable inquiry could have known, that, at the time it last contracted with Wix, he had a propensity for becoming intoxicated, and thus dangerous, as the driver of a motor vehicle. Under the foregoing authorities, said evidence was thus sufficient for submission to the jury on the question of National's negligence in entrusting Wix with the trailer-pulling assignment on the occasion in question, and of its resulting liability for his negligent operation of the truck used in it.

■ Under its Proposition III, National contends that the trial judge erred in overruling the following motion its attorney dictated into the record:

"Now comes the defendant, National Trailer Convoy and moves the Court to require plaintiff to elect the theory of negligence upon which (s)he seeks to submit this cause to the jury * * *, it being the position of this defendant that the theory of agency and the theory of dangerous instrumentality are wholly unrelated and repugnant to each other in the submission of the case to the jury."

National bases its claim of the incompatibility of the cited theories on the contention that if, at the time of the accident, Wix was within the scope of his agency, any consideration of whether or not National should have engaged him, was immaterial—and conversely, if National was negligent in engaging Wix, then whether or not he was, at that time, within the scope of his agency, was immaterial. National cites Gypsy Oil Co. v. Colbert, 179 Okl. 321, 65 P.2d 505, and Hopkins v. Stoddard, Okl., 301 P.2d 1001, with the inference that both cases involved inconsistent theories of liability. Neither case is applicable to the present one. Here, the two theories upon which plaintiff sought to establish National's liability were (to use the words of the Gypsy Oil Company case) "cumulative, conjunctive and consistent", rather than "repugnant or inconsistent". One theory merely has to do with the liability of a contractee for the negligence of its contractor within the scope of his agency on a job involving potential danger to the public or third persons; while the other has to do with the primary liability of one who causes a chattel to be placed in the hands of another under circumstances rendering foreseeable the likelihood of its becoming a dangerous instrumentality. Neither is inconsistent with the other; and the jury could have consistently determined that National was liable on either one of these theories, or on both—as they evidently did. (In this connection, notice Eagle Motor Lines v. Mitchell, 223 Miss. 398, 78 So.2d 482, in which—though it differs from this case in that the driver was an employee operating his employer's truck—the court held there was no error in refusing an instruction which ignored the plaintiff's theory of negligent entrustment and would have authorized a verdict for defendant, unless the driver was determined to have been acting within the scope of his employment at the time of the accident).

■ In argument under two propositions, which can properly be directed only at the trial court's alleged error in overruling its motion for a directed verdict (rather than at said court's ruling on its demurrer to plaintiff's evidence), the Turnpike Authority assumes two positions: (1) That without the assertedly inadmissible testimony of conversations its toll booth, or gate, attendant had with two certain witnesses after the accident, there would have been no evidence upon which to submit the question of the Authority's liability for the accident; and (2) There was no evidence

to establish the Authority's liability, even if the assertedly inadmissible evidence had been admissible.

The trial court's admission of the assertedly inadmissible evidence occurred during the course of plaintiff's attempt to prove that the attendant (as recognized Agent of the Authority) knew, or should have known, that the truck driver, Wix, was under the influence of liquor, when, after changing his mind about going to his home in Claremore, he turned his truck around in the direction of Tulsa, drove it to the Claremore toll gate, purchased a turnpike ticket from the Attendant, and was allowed to drive back on the turnpike.

Although the Authority's argument pertaining to (1) above is virtually all directed at attempting to show that only one of plaintiff's witnesses, an Assistant County Attorney, was improperly allowed to relate statements the Attendant made to him at some time after the accident (indicating he had such knowledge, or belief) the Authority is evidently of the opinion that error was also committed in the admission of testimony of similar import from another of plaintiff's witnesses, Patrolman Reese. It is our opinion, however, that the Authority's argument fails to demonstrate prejudice by such alleged errors, for we think such evidence was merely cumulative, in view of the Attendant's admission that he had given a deposition to the same effect (see Yellow Transit Freight Lines v. Allred, Okl., 302 P.2d 985, 4th Syll.); and it was for the jury to determine whether, in his testimony, the Attendant satisfactorily explained, and/or negated, such sworn statement. After the attendant testified that, as Wix drove through the Claremore gate, to come off of the turnpike, " * * * he slurred a word or two * * *", then made a U-turn with the truck outside the gate, and came back to the entrance lane of the gate, where he (the Attendant) issued him a new "fare ticket" for Tulsa, this witness further testified, in part:

"A (Wix) * * * still * * * slurred his words and * * * he

asked me if I'd ever been on a drunk, and I looked at him kind of puzzled and didn't answer his question, and he said he had been out on one or was out on one, and then at that point I started to look in his * * * (truck) and observing him to determine the amount of drink he'd had, if possible, * * *

" * * * I asked him if he was all right, * * *. And I thought maybe he had joked about being on the drunk and that's why I asked him, I wanted to talk to him further to determine if he was able to drive his vehicle, and I told him something about going home and getting some turkey and he'd be all right, * * *.

"Q Now, at the time that he went through there did you have any reason to believe that he was intoxicated at that time?

"A Well, no reason to believe he was—had enough drink to not operate his vehicle properly.

"Q Now, what is your practice, or what are your instructions with refference to intoxicated drivers, * *?

"A One comes up that is obviously intoxicated, we tell them they should not be on the turnpike * * *.

"Q Then you say if they come up obviously drunk, you try to get them not to go on * * *?

"A Yes, sir, and if they still insist on going on, inform them that we shall call the patrolman and have them investigated.

"Q And do you do that?

"A Yes, sir.

"Q * * *—What about these people that come up there who may have had drinks or something of that

character? What do you do in those cases?

"A If we see empty bottles or open bottles or even beer cans in the car, or can smell, which is very hard to do at that distance, we immediately call the patrol, which has to go through Oklahoma City, then they in turn call the patrol.

"Q Is that done by radio and you have a phone there?

"A Yes, sir.

"Q Is that phone connected direct with the tower?

"A The tower at Oklahoma City. You have to ring the tower first, and then they will answer your call, and then you give them the number you want and they will in turn call the number.

"Q Now, did you call in to make any report about this man after he left?

"A No, sir.

"Q Why didn't you?

"A Well, there were two reasons I suppose. One was Captain Reese was the only one on the turnpike. He was at Vinita, which was thirty-five miles east, and Mr. Wix stated he was going to Tulsa. The other was, he was driving his vehicle properly, and I had no indication that he was drunk beyond driving, or even drunk of any sort, only besides what he had told me about 'had been on a drunk.'

"Q All right, sir. Now, have you had occasion to call him about various people whom you did have suspicions of?

"A Yes, sir.

"Q How many people have you called in on?

* * * * * *

"A Oh, I would say fifty.

* * * * * *

"Q Now, have you ever called * * to report * * * (anybody) as being possibly drunk, and it turned out that they were not drinking at all?

"A Yes, sir, several times.

* * * * * *

"Q When you have occasion to be suspicious of a driver going on do you get the license number?

"A Yes, sir, try to get the license number, the description, make, model of the vehicle.

"Q I see. Did you do that in this instance?

"A No, sir.

* * * * * *"

On cross-examination, the witness testified in part as follows:

"Q * * *, it did not appear strange to you that this man, when he came up says, 'How do I get to Claremore', and then a moment later, he said, 'How do I get to Tulsa?'

* * * * * *

"A It could have, yes, sir, I don't remember.

* * * * * *

"Q Well, you visited with him for some five or ten minutes there, did you not?

"A Possibly, yes, sir."

The cross-examiner then commenced interrogating the witness about his deposition. The first of the following questions pertains to a remark he made, after Captain Reese had finally been contacted by another source, and had searched' for and found Wix asleep in his truck, and brought him in custody in his patrol car off of the turnpike at the gate where the witness was on duty.

"Q * * * did you tell Captain Reese or Mr. Wix when they came off of the turnpike that 'If I had done what I should have done, these people would not have been in the hospital?'

"A I believe I stated if I had called, that those people might not have been in the hospital, yes, sir.

* * * * * *

"Q * * *—Do you say at this time in your opinion, when Mr. Wix came back on the turnpike after that five or ten minutes visit with you, that he was or was not under the influence of intoxicating liquor, in your opinion?

"A I couldn't tell.

"Q * * * Now, you have been asked that question on two or three occasions before under oath, haven't you, sir?

"A Yes, sir.

"Q All right. Referring to Page 7 of the deposition.

* * * * * *

"Were you asked this question: 'Do you feel that you can tell when a person is intoxicated? And your answer is 'Yes, sir.' You recall that question and answer?

"A Yes, sir.

"Q And is it your opinion that Mr. Wix was or was not intoxicated at the time he came on to the turnpike? And you answered, 'It is my opinion that he was.'

"A Yes, sir.

"Q Did you make that answer?

"A Yes, sir.

* * * * * *

"Q Now, this man (Wix) went through the turnpike and went out there and turned around some place; did you watch him while he turned around?

"A * * *, I believe I did.

* * * * * *

"Q All right. He came back to the gate, and you determined at that time that he was drunk?

"A Yes, sir.

"Q * * * from the gate there where you sit, you could watch that truck had you wanted to and you could have determined in which direction he went after he left your gate—* * *?

"A Yes, sir.

"Q When he got out to the highway, but you didn't do that?

"A No, sir.

"Q Even though you knew at that time that there was an intoxicated driver going out on the turnpike?

"A Possibly intoxicated.

* * * * * *

"Q Now, you say and tell the jury and the Court that it is your duty, if a man is intoxicated and tries to get through the turnpike, that you do something about it?

"A Yes, sir.

* * * * * *

"RECROSS EXAMINATION

"Q You know you are only a half a mile or a mile from the patrol headquarters, don't you?

"A It was at that time, yes, sir."

We think the above quoted testimony of the Authority's Toll Booth Attendant speaks for itself, and furnishes an adequate answer to the Authority's argument that the evidence was insufficient to show that the Authority, through said agent, knew, or should have known, Wix was intoxicated so as to create a menace to other motorists, if allowed to drive his truck on the turnpike. The Authority does not argue that if it was negligent in discharging a duty toward plaintiff in respect to that matter, such negligence did not concur with that of Wix, in constituting the proximate cause of the accident, and plaintiff's intestate's death. Nor does it directly deny that, as indicated by the undisputed testimony of the Attendant and others, it has the duty of taking the measures described therein, to prevent, or stop, drivers, who are believed to be intoxicated, from operating their motor vehicles thereon. Although it seems to be the position of the Authority that, on the basis of this court's opinion in Oklahoma Turnpike Authority v. Kitchen, Okl., 337 P.2d 1081, the responsibility for enforcing this State's traffic laws on its turnpikes belongs to its Department of Public Safety—rather than to the Authority—

it, at the same time, seems to concede that it is obliged to "cooperate" with said Department in preventing violations of said laws on said roads. Accepting the Authority's own said definition of its area of responsibility, for the purpose of this appeal only, we are of the opinion that the evidence in this case was sufficient to go to the jury on the question of whether or not the Authority had discharged that responsibility. The Authority specifically recognizes that in the cited case, we did not decide whether or not it would have been liable therein, had the evidence been sufficient to show it knowingly permitted an intoxicated driver to enter the turnpike. It contends (in its reply brief) however, that " * * * there were circumstances just as strong, if not more so, about the driver being intoxicated when entering the Turnpike and the gate Attendant having as much opportunity to know of it as existed here." We do not agree. Here, there was not only an abundance of evidence tending to show that Wix was intoxicated when he drove his truck back onto the turnpike, through the gate where the Attendant was on duty (including the undisputed fact that Wix could not remember anything about the accident and was not aware that any such thing had occurred, the evidence indicating that, between Tulsa and the place he was found, he disposed of the last half of the "fifth" of whiskey he had purchased in Wichita Falls, and his own sworn statement that: "It doesn't take very much to make me intoxicated * * *.") but, also, competent evidence that the Attendant knew, or in the reasonable performance of his duty, should have known, of such intoxication.

As, in view of the foregoing, the arguments advanced by National, and the Authority, have failed to demonstrate that the trial court committed any prejudicial, or reversible, error, the judgment of said court is hereby affirmed.

WILLIAMS, C. J., and DAVISON, JOHNSON and BERRY, JJ., concur.

HALLEY, J., concurs as to Oklahoma Turnpike Authority, and dissents as to National Trailer Convoy, Inc.

WELCH, JACKSON and IRWIN, JJ., dissent.